2003 ND 81

**STATE of North Dakota, Plaintiff and Appellant,**

v.

**Christopher Ray FIELDS, Defendant and Appellee.**

No. 20020269.

Supreme Court of North Dakota.

June 3, 2003.

Ladd R. Erickson, Special Assistant State's Attorney, Washburn, ND, for plaintiff and appellant.

Steven M. Light (argued) and Lindsey D. Haugen (appeared), Larivee & Light, Grand Forks, ND, for defendant and appellee.

MARING, Justice.

[¶ 1] The State of North Dakota appeals from the Memorandum Opinion and Order granting Christopher Fields' Motion to Suppress. We affirm.

[¶ 2] At approximately 3:24 a.m. on May 28, 2002, a Morton County Sheriff's Deputy noticed Christopher Fields driving his vehicle on the 1000 block of 6th Avenue Northwest in Mandan. The officer initiated a traffic stop. Earlier that morning, the officer had been informed that the license tags on Fields' vehicle were expired. The officer was also told by another officer that the drug task force had information that Fields had received a shipment of drugs a few days earlier. The officer knew Fields from a previous arrest on drug charges and knew that, according to other officers and a confidential informant, Fields was continuing to deal drugs.

[¶ 3] During the stop, Fields was asked for his driver's license, registration, and proof of insurance. Fields provided his driver's license, but did not have his registration or proof of insurance. The officer testified that Fields was acting nervous during the stop. When asked why he was driving so late at night, Fields told the officer that he was on his way to a convenience store to buy milk and cereal.

[¶ 4] After the officer issued Fields a citation for the expired tags, he said goodbye, turned, and began to walk away. The officer then reapproached the vehicle and asked Fields if he had any drugs or weapons in the vehicle. Fields said that he did not. The officer next asked for Fields' consent to search the vehicle. Fields refused consent. At this point, the officer informed Fields he was calling for a drug detection dog to do a canine search of the outside of the vehicle. The officer asked Fields to exit his vehicle and stand next to him. It took approximately 30 minutes for the drug detection dog to arrive on the scene. When the dog arrived, it made a few passes and then gave positive indications on the vehicle. The vehicle was searched, revealing a loaded gun and illegal drugs.

[¶ 5] Fields filed a motion to suppress the evidence discovered during the vehicle search. He argued that the evidence found during the vehicle search should be excluded because the officer lacked a reasonable and articulable suspicion to continue the detention after the original purpose of the traffic stop had been completed and because the officer did not have probable cause to search the vehicle. The trial court granted Fields' Motion to Suppress. The State appeals.

I

[¶ 6] The trial court's disposition of a motion to suppress will be af-

firmed unless, after resolving conflicting evidence in favor of affirmance, there is insufficient competent evidence fairly capable of supporting the trial court's findings or the decision is contrary to the manifest weight of the evidence. *See City of Fargo v. Ovind,* 1998 ND 69, ¶ 6, 575 N.W.2d 901. This deferential standard of review recognizes the importance of the trial court's opportunity to assess the credibility of the witnesses. *See id.* "The ultimate conclusion of whether the facts support a reasonable and articulable suspicion is a fully reviewable question of law." *Id.*

II

[¶ 7] Neither party disputes the fact that the initial stop of Fields' vehicle was proper. As we have previously explained, "traffic violations, even if considered common or minor, constitute prohibited conduct and, therefore, provide officers with requisite suspicion for conducting investigatory stops." *State v. Storbakken,* 552 N.W.2d 78, 80–81 (N.D.1996). In this case, the officer had earlier been told that Fields' vehicle had expired tabs. When the officer saw the vehicle being driven and verified that the tabs were expired, he had probable cause to believe the law was being violated and, therefore, properly initiated a traffic stop. *See Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

[¶ 8] When conducting a traffic stop, an officer can temporarily detain the traffic violator at the scene of the violation. *See State v. Mertz,* 362 N.W.2d 410, 412 (N.D.1985) (citing N.D.C.C. §§ 39–07–07 and 39–07–09). The constitutionality of an investigative detention is judged under the framework established in *Terry v. Ohio,*

392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), requiring that an investigative detention be "reasonably related in scope to the circumstances which justified the interference in the first place." This Court has explained that for traffic stops, "[a] reasonable period of detention includes the amount of time necessary for the officer to complete his duties resulting from the traffic stop." *Mertz,* at 412. Those duties, according to the Court of Appeals for the Eighth Circuit, may include:

> request[ing] the driver's license and registration, request[ing] that the driver step out of the vehicle, request[ing] that the driver wait in the patrol car, conduct[ing] computer inquiries to determine the validity of the license and registration, conduct[ing] computer searches to investigate the driver's criminal history and to determine if the driver has outstanding warrants, and mak[ing] inquiries as to the motorist's destination and purpose.

*United States v. Jones,* 269 F.3d 919, 924 (8th Cir.2001). The investigative detention may continue "as long as reasonably necessary to conduct these activities and to issue a warning or citation." *Id.* at 925; *see also Mertz,* at 412 ("[A] traffic violator is subject to the arresting officer's authority and restraint until the officer completes issuance of the traffic citation and expressly releases the violator.").

[¶ 9] In this case, the officer issued Fields a citation for the expired tabs and expressly released Fields by saying goodbye, turning around, and starting to walk back to his vehicle. After the officer issued the traffic citation, the legitimate investigative purposes of the traffic stop were completed. *See Jones,* 269 F.3d at 925 (stating that once the trooper had determined that the driver was not tired or intoxicated, had verified that the driv-

er's license and registration were valid, and had checked for any outstanding arrest warrants, the legitimate investigative purposes of the traffic stop were completed).

### III

■ [¶ 10] Once the purposes of the initial traffic stop are completed, a continued seizure of a traffic violator violates the Fourth Amendment unless the officer has a reasonable suspicion for believing that criminal activity is afoot. *See Jones,* 269 F.3d at 925. Therefore, the constitutional inquiry in this case is reduced to two determinations: whether Fields was "seized" within the meaning of the Fourth Amendment when he was held awaiting the arrival of the drug detection dog, and if so, whether there was a reasonable suspicion to support the seizure. *See id.*

### A

■ [¶ 11] This Court has recognized that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *State v. Koskela,* 329 N.W.2d 587, 589 (N.D.1983) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). In *United States v. Beck,* 140 F.3d 1129 (8th Cir. 1998), the United States Court of Appeals for the Eighth Circuit was confronted with a situation similar to the one in this case. In *Beck,* the driver was stopped for following another vehicle too closely. The officer checked the driver's license, rental agreement, and criminal history before giving him a verbal warning and telling him he was free to go. The officer started walking away, but returned to ask the driver if he had any guns, drugs, or knives in the vehicle. The officer asked for con-

sent to search the vehicle, but the driver did not give consent. The officer then radioed for a canine unit and told the driver that a drug sniff of the vehicle would be conducted. The officer instructed the driver to get out of the vehicle and to stand by the side of the car. When the canine unit arrived, the dog alerted to the passenger side rear door of the vehicle. A search was conducted and methamphetamine was discovered. In determining whether the driver had been "seized" for Fourth Amendment purposes, the court concluded:

> [W]e do not believe a person in Beck's situation, who had been present when a canine unit had been summoned to the scene and was then told by [the officer] that he was going to have a canine unit conduct a drug sniff of Beck's car, would reasonably have felt free to leave.
>
> Furthermore, any doubts that Beck had that he was free to drive away were extinguished when, after refusing consent to a search of his automobile, [the officer] ordered Beck to get out of his automobile and to stand on the side of the road. At that point, having been ordered out of his vehicle in order to permit a drug dog sniff, a reasonable person in Beck's situation would not have felt free to leave.

*Beck,* 140 F.3d at 1135–36.

[¶ 12] In this case, after Fields refused to consent to a search of his vehicle, he was told that the drug detection dog would be called and that a drug sniff of his vehicle would be conducted. The officer asked Fields to get out of his car and to stand by him. It is reasonable to believe that a person in Fields' position would not have felt free to leave the scene. We conclude that Fields was seized within the meaning of the Fourth Amendment when he was held awaiting the arrival of the drug detection dog. Therefore, unless the

officer had a reasonable and articulable suspicion to believe that criminal activity was afoot, the continued detention of Fields after the completion of the traffic stop would amount to a Fourth Amendment violation.

### B

[¶ 13] Whether the facts support a reasonable and articulable suspicion is a question of law, fully reviewable on appeal. *See Ovind,* 1998 ND 69, ¶ 6, 575 N.W.2d 901. This Court considers the totality of the circumstances when deciding whether reasonable suspicion exists. *See id.* at ¶ 8. "Although we have recognized that the concept of reasonable suspicion is not readily reduced to a neat set of legal rules, it does require more than a 'mere hunch.'" *State v. Kenner,* 1997 ND 1, ¶ 8, 559 N.W.2d 538 (quoting *Salter v. North Dakota Dep't of Transp.,* 505 N.W.2d 111, 114 (N.D.1993)). To determine whether reasonable suspicion exists, we apply an objective standard, taking into account the inferences and deductions that an investigating officer would make that may elude a layperson. *See Kenner,* at ¶ 8. "The question is whether a reasonable person in the officer's position would be justified by some objective manifestation to suspect the defendant was, or was about to be, engaged in unlawful activity." *Id.* (quoting *State v. Smith,* 452 N.W.2d 86, 88 (N.D. 1990)).

[¶ 14] At the time that Fields was being detained to wait for the drug detection dog, the officer knew the following: (1) that in April 2002, Fields was arrested when drugs and drug paraphernalia were found in his motel room and vehicle; (2) that according to other officers, Fields was continuing to deal drugs; (3) that a confidential informant who had previously given an accurate tip had indicated that Fields was continuing to deal drugs; (4) that the drug task force had information that Fields had received a shipment of drugs a few days earlier; (5) that during the traffic stop, Fields was acting nervous; and (6) that during the traffic stop, Fields gave a "suspicious" story about going out for milk and cereal at 3:24 a.m.

[¶ 15] The first factor, the officer's knowledge of Fields' criminal history, "is a legitimate factor to be taken into account in determining whether there is a sufficient quantum of suspicion...." 4 Wayne R. LaFave, *Search and Seizure* § 9.4(f), 192 (3d ed.1996). In this case, the officer had, just the month before, executed a search warrant on Fields' motel room and vehicle, discovering methamphetamine and drug paraphernalia. However, knowledge of a person's criminal history by itself is not enough to support a finding of reasonable suspicion. *See id.* at 192–93; *see also United States v. Sandoval,* 29 F.3d 537, 542 (10th Cir.1994). As the court in *Sandoval* correctly observed:

> If the law were otherwise, any person with any sort of criminal record—or even worse, a person with arrests but no convictions—could be subjected to a Terry-type investigative stop by a law enforcement officer at any time without the need for any other justification at all. Any such rule would clearly run counter to the requirement of a reasonable suspicion, and of the need that such stops be justified in light of a balancing of the competing interests at stake....

29 F.3d at 543. The reasonable suspicion determination is not so clear cut, however, when, as in this case, a criminal history is not the only factor that could contribute to finding reasonable and articulable suspicion. *See id.* at 542 (recognizing that although knowledge of a person's criminal history is, in itself, insufficient to justify a seizure, in combination with other factors,

it can constitute reasonable suspicion of current criminal activity).

[¶ 16] The second, third, and fourth factors, all concern information, given to the officer, which indicated that Fields was continuing to participate in drug activities. Specifically, there was information from the confidential informant that Fields was continuing to deal drugs. This same information was also provided by the other officer. There also was information from the other officer that Fields had just recently received a shipment of drugs. We have stated that "[a] tip may provide the factual basis for a reasonable suspicion stop." *State v. Boline*, 1998 ND 67, ¶ 32, 575 N.W.2d 906. When determining whether information available to an officer establishes reasonable and articulable suspicion, it must be evaluated for its "quantity, or content, and quality, or degree of reliability, . . ." *Id.*

[¶ 17] In this case, all the information given to the officer, both from the confidential informant and from the other officer, was conclusory in content. There were no specific facts that connected Fields' alleged drug activities to Fields' vehicle or to his travels on the night he was stopped. There was only conclusory information that Fields continued to deal drugs and had received a shipment a couple of days prior.

[¶ 18] In addition, while the information from the confidential informant may have had some degree of reliability because that same confidential informant had provided law enforcement with accurate information in the past, it is unclear whether the information provided by the other officer was reliable. Just as reliability of an informant is an important consideration for a probable cause determination, it is also relevant in the reasonable suspicion analyisis, "although allowance must be made in applying them for the lesser showing required to meet that standard." *See Alabama v. White*, 496 U.S. 325, 328–29, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). According to the officer's testimony, he received the information that Fields had recently received a shipment of drugs from another officer who had been given the information by the drug task force. However, there is no indication in the record where the drug task force got its information. Therefore, the reliability of that information is questionable.

[¶ 19] The fifth factor relates to the officer's testimony that Fields was very nervous during the stop. "Nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *State v. Heitzmann*, 2001 ND 136, ¶ 15, 632 N.W.2d 1 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). However, nervousness alone is not enough to establish a reasonable and articulable suspicion because "[i]t certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer." *Beck*, 140 F.3d at 1139.

[¶ 20] The sixth factor to consider is the officer's disbelief of Fields' explanation for driving late at night. "The lateness of the hour is another fact that may raise the level of suspicion." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir.1993) (citing *United States v. Knox*, 950 F.2d 516, 519 (8th Cir.1991)). When he was stopped at 3:24 a.m., Fields claimed that he was driving to a convenience store to buy milk and cereal. The officer thought that this "story" was "suspicious." Courts have recognized that unusual or suspicious travel plans may give rise to reasonable suspicion. *See Beck*, 140 F.3d at 1139 (citing *United States v. Wood*, 106 F.3d 942, 946–47 (10th Cir.1997)). However, in this case, Fields' explanation can describe innocent behavior. People often-

times find it necessary to purchase goods at night. That is precisely why some stores are open 24 hours a day. Additionally, there are many people who, because of work or other reasons, do not keep regular hours and would need to do their shopping at night.

[¶ 21] Although the State has advanced several factors, which are valid considerations in forming reasonable suspicion, we conclude that the combination of factors present in this case is not sufficient to provide the officer with a reasonable and articulable suspicion that criminal activity was afoot. *See Jones*, 269 F.3d at 929. *But see State v. Lee*, 265 Neb. 663, 658 N.W.2d 669 (Neb.2003). Before the initial traffic stop occurred, the officer had knowledge of Fields' past criminal history and of the non-specific information received from fellow officers and a confidential informant. Undisputably, this information did not amount to the reasonable and articulable suspicion needed to initiate a traffic stop; it was the officer's knowledge of the expired tabs that made the initial traffic stop valid. The only additional observations made by the officer during the initial stop were Fields' nervous behavior and his "suspicious" story about going to the convenience store at 3:24 a.m. Nervousness during a traffic stop and traveling during the late-night hours are acts that could "describe a very large category of presumably innocent travelers." *Jones*, at 927 (quoting *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980)). Considering the totality of the circumstances in this case, we conclude that the officer in this case was acting on a "mere hunch" when he seized Fields to wait for the drug detection dog. Reasonable suspicion requires more than a "mere hunch." *See Kenner*, 1997 ND 1, ¶ 8, 559 N.W.2d 538. We conclude that the continued detention of Fields past the point necessary to complete the initial traffic stop violated his Fourth Amendment right to be free from unreasonable seizure. Therefore, the evidence obtained as a result of the unlawful detention is tainted and should be suppressed. *See Jones*, at 929; *Beck*, 140 F.3d at 1140 (both citing *Wong Sun v. United States*, 371 U.S. 471, 484–86, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). The trial court properly granted Fields' Motion to Suppress. We affirm.

[¶ 22]WILLIAM A. NEUMANN and CAROL RONNING KAPSNER, JJ., concur.

VANDE WALLE, Chief Justice, concurring specially.

[¶ 23] I concur in the result reached by the majority opinion. Although the officer may have had reasonable suspicion that Fields was dealing in drugs, I agree with the majority opinion there is no evidence to support a reasonable suspicion he had drugs in the motor vehicle as opposed to his home, place of business or other places he frequented or which he might have owned.

[¶ 24]GERALD W. VANDE WALLE, C.J.

SANDSTROM, Justice, dissenting.

[¶ 25] Because the majority misapplies the law, I respectfully dissent.

[¶ 26] We affirm factual findings in preliminary proceedings unless they are not supported by sufficient competent evidence or they are contrary to the manifest weight of the evidence. *City of Fargo v. Thompson*, 520 N.W.2d 578, 581 (N.D. 1994). We do not make our own factual findings. *Lock v. Moore*, 541 N.W.2d 84, 86 (N.D.1995).

[¶ 27] Whether the facts support a reasonable and articulable suspicion is a fully reviewable question of law. *City of Fargo*

*v. Ovind,* 1998 ND 69, ¶ 6, 575 N.W.2d 901. In determining whether a reasonable suspicion exists, we apply an objective standard, taking into account the inferences and deductions an investigating officer would make that might elude a layperson. *State v. Kenner,* 1997 ND 1, ¶ 8, 559 N.W.2d 538. We are to consider the totality of the circumstances in deciding whether reasonable suspicion exists. *Ovind,* at ¶ 8.

[¶ 28] The majority, at ¶¶ 15–21, instead of considering the totality of the circumstances, parses the circumstances. The majority, at ¶ 20, injects "facts" of its own. And, the majority, at ¶ 18, *e.g.,* applies a standard more akin to probable cause to test whether there was reasonable suspicion.

[¶ 29] At 3:24 in the morning, a law enforcement officer stopped Fields for driving with expired motor vehicle license tags. The officer knew that Fields had been arrested for drug dealing the previous month. The officer knew the Metro Area Narcotic's Task Force had reported that Fields had recently received a drug shipment and that a confidential informant had reported Fields continued to deal drugs. Fields was acting nervous and gave what the officer considered to be an implausible story, claiming he had gone out to buy milk at 3 o'clock in the morning. Given these circumstances, would a reasonable officer be reasonably suspicious? I believe a reasonable officer would be.

[¶ 30] Would a reasonable officer reasonably think Fields was giving an implausible story and acting nervous *because* his drugs were stashed at a *different* location? Or would a reasonable officer—exercising common sense and professional expertise—reasonably suspect Fields was giving an implausible story and acting nervous because the drugs were present at the scene? I believe a reasonable officer would believe the latter.

[¶ 31] I would reverse the district court's order suppressing the drugs seized after subsequent probable cause led to a search.

[¶ 32]DALE SANDSTROM, J.