2016 ND 215

STATE of North Dakota, Plaintiff
and Appellee

v.

Abdullahi Ahmed ADAN, Defendant
and Appellant.

State of North Dakota, Plaintiff
and Appellee

v.

Semereab Haile Tesfaye, Defendant
and Appellant.

Nos. 20160083, 20160095.

Supreme Court of North Dakota.

Nov. 21, 2016.

Justin J. Schwarz, Assistant State's Attorney, Burleigh County Courthouse, Bismarck, ND, for plaintiff and appellee; submitted on brief.

Laura C. Ringsak, Bismarck, ND, for defendant and appellant Abdullahi Ahmed Adan; submitted on brief.

Kyle M. Melia, Bismarck–Mandan Public Defender Office, Bismarck, ND, for defendant and appellant Semereab Haile Tesfaye; submitted on brief.

VANDE WALLE, Chief Justice.

[¶ 1] Abdullahi Ahmed Adan and Semereab Haile Tesfaye appealed the judgments entered on conditional pleas of guilty to the charges of possession of a controlled substance with intent to manu-

facture or deliver. We affirm, concluding there was reasonable suspicion to extend the traffic stop and that the district court properly denied their motions to suppress evidence gathered as a result of the continued detention.

I.

[¶ 2] While driving westbound on I–94, Officer Steven Clark observed a maroon, four-door car traveling east at approximately 73 mph in a 75 mph zone. The vehicle appeared to weave in its lane and Officer Clark noticed that the vehicle was from out of state. After turning around to follow it, Officer Clark noted that the vehicle had slowed down to approximately 70 mph. From several car lengths behind, Officer Clark saw the driver reach into the backseat of the vehicle and appear to place a blanket or jacket over something in the backseat. Officer Clark pulled alongside the vehicle and observed the driver with his hands at ten and two on the wheel, staring intently forward, and a passenger who appeared to be sleeping. While alongside the vehicle, Officer Clark observed the driver moving the corner of his mouth, as if he were trying to hide his conversation with the passenger. However, not seeing any traffic infractions, Officer Clark stopped following the vehicle.

[¶ 3] Although he did not see any traffic infractions, Officer Clark remained suspicious of the vehicle and called Officer Steve Edwards to relay his suspicions and tell him to be on the lookout for the vehicle. While talking with Officer Edwards, Officer Clark also relayed all of the information he observed while following the vehicle. Officer Edwards located the suspicious vehicle and observed it speeding and following too close to the vehicle in front of it. Based on these traffic violations, Officer Edwards initiated a traffic stop.

[¶ 4] The driver pulled off to the side of the road and left his blinker on. Officer Edwards identified the driver as Adan and the passenger as Tesfaye. During the traffic stop, Officer Edwards observed a blanket, covering approximately half of the backseat, an air freshener, a bottle of Ozone scent spray, a global positioning system ("GPS"), eye drops, a lighter, and an energy drink in the vehicle.

[¶ 5] Officer Edwards asked Adan to come back to his patrol vehicle to answer a few questions. During this time, Adan appeared nervous to Officer Edwards; Adan touched his face, licked his lips, and his shoulders quivered. Adan confirmed that the vehicle was a rental and explained that he had rented the vehicle in St. Cloud and used it to travel to Fargo and then to Watford City to drop a friend off for work. Officer Edwards stated that he did not observe any luggage consistent with this length of a trip, but acknowledged that he did not look in the trunk of the car for any luggage.

[¶ 6] Officer Edwards also noted that during his interactions with Tesfaye, Tesfaye appeared to be evasive, never looking him in the eye. When questioned about the travel plans, Tesfaye replied that he and Adan were traveling from the Williston area. Tesfaye was also unable to recall the name of the passenger Adan had dropped off, even though they had ridden together for a couple of days.

[¶ 7] Through a records check, Officer Edwards discovered that Tesfaye was recently placed on probation for possession of methamphetamine. After this discovery, Officer Edwards asked Tesfaye if there was anything illegal in the vehicle and whether there was any methamphetamine or marijuana. Tesfaye answered, "No," to each inquiry, but broke eye contact with Officer Edwards when asked about the presence of marijuana. During

the course of the traffic stop, Officer Edwards did not smell the odor of marijuana nor did he observe any drug paraphernalia.

[¶ 8] After the traffic stop, Officer Edwards issued Adan a warning and asked if Adan had time to answer a few more questions; Adan agreed. Officer Edwards asked a few questions about Adan's trip before asking permission to search his vehicle and have a dog walk around it. Adan did not consent. Officer Edwards called dispatch to send a K–9 to his location. Forty-five minutes later, a K–9 arrived and signaled on the presence of narcotics. After a search of the vehicle, officers seized over two pounds of marijuana.

## II.

[¶ 9] When reviewing a district court's denial of a motion to suppress, we defer to the trial court's findings of fact. *State v. Kitchen*, 1997 ND 241, ¶ 11, 572 N.W.2d 106. However, questions of law are fully reviewable on appeal. *State v. Bartelson*, 2005 ND 172, ¶ 7, 704 N.W.2d 824. Whether the facts support a finding of reasonable articulable suspicion is a question of law, and thus, is fully reviewable by this Court. *State v. Fields*, 2003 ND 81, ¶ 6, 662 N.W.2d 242.

[¶ 10] The parties do not dispute the fact that the initial stop of Adan and Tesfaye's vehicle was proper. As we have previously stated, "traffic violations, even if considered common or minor, constitute prohibited conduct and, therefore, provide officers with requisite suspicion for conducting investigatory stops." *State v. Stadsvold*, 456 N.W.2d 295, 296 (N.D. 1990). In this case, Officer Edwards observed the vehicle speeding and following too close to the vehicle in front of it. When Officer Edwards observed these traffic infractions, he had probable cause to believe the law was being violated and,

thus, properly initiated a traffic stop. *See Whren v. U.S.*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (holding that the officer's subjective intent for stopping the vehicle was not relevant in determining the validity of the traffic stop).

[¶ 11] During a valid traffic stop, "an officer can temporarily detain the traffic violator at the scene of the violation." *Fields*, 2003 ND 81, ¶ 8, 662 N.W.2d 242. The duration of the investigatory detention may continue "as long as reasonably necessary to conduct [the officer's duties resulting from the traffic stop] and to issue a warning or citation." *Id.* (citing *United States v. Jones*, 269 F.3d 919, 925 (8th Cir.2001)). When the original purpose of the traffic stop is complete, the officer must have a reasonable suspicion that criminal activity is afoot to continue the detention. *Fields*, at ¶ 10. Any further detention, without reasonable suspicion, violates the traffic offender's Fourth Amendment rights against unreasonable searches and seizures. *Id.*

[¶ 12] When deciding whether reasonable suspicion exists, this Court looks at the totality of the circumstances, applies an objective standard, and takes "into account the inferences and deductions that an investigating officer would make that may elude a layperson." *Fields*, 2003 ND 81, ¶ 13, 662 N.W.2d 242. "The question is whether a reasonable person in the officer's position would be justified by some objective manifestation to suspect the defendant was, or was about to be, engaged in unlawful activity." *State v. Kenner*, 1997 ND 1, ¶ 8, 559 N.W.2d 538 (quoting *State v. Smith*, 452 N.W.2d 86, 88 (N.D.1990)). Additionally, information obtained by one officer may be used by another to establish reasonable suspicion if the first officer conveyed the information to the second officer. *Ell v. Dir.*, 2016 ND

164, ¶ 10, 883 N.W.2d 464; *State v. Miller*, 510 N.W.2d 638, 643–44 (N.D.1994).

### III.

[¶ 13] On appeal, Adan and Tesfaye argue that after they were given a written warning for their driving conduct, Officer Edwards lacked a reasonable and articulable suspicion that criminal activity was afoot to continue to detain them.

[¶ 14] The district court found that Officer Edwards relied upon a number of different factors in establishing a reasonable, articulable suspicion. Such factors include: the information relayed to him by Officer Clark, the nervousness of both Adan and Tesfaye, the different accounts of the trip's destination, items he observed in the vehicle, Tesfaye's criminal history, and the fact the vehicle was a rental.

#### A. Nervousness

[¶ 15] An individual's nervousness during a traffic stop "is a pertinent factor in determining reasonable suspicion." *State v. Heitzmann*, 2001 ND 136, ¶ 15, 632 N.W.2d 1 (citing *Illinois v. Wardlow*, 528 U.S. 119, 120, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). However, nervousness alone is insufficient to establish a reasonable suspicion. *Fields*, 2003 ND 81, ¶ 19, 662 N.W.2d 242.

[¶ 16] Here, both Adan and Tesfaye exhibited signs of nervousness. Adan's first signs of nervousness occurred when Officer Clark was following the vehicle. Officer Clark observed Adan driving rigidly with his hands gripped tightly at ten and two and placing a blanket or jacket in the backseat as if attempting to cover something up. Officer Clark also thought it was suspicious that Adan avoided eye contact with him and looked like he was talking out of the side of his mouth to Tesfaye, even though Tesfaye appeared to be sleeping. After disengaging the vehicle, Officer Clark called Officer Edwards and informed him of his observations. Because these observations were properly relayed to Officer Edwards, this Court may use Officer Clark's observations in its determination of whether Officer Edwards had a reasonable suspicion of criminal activity.

[¶ 17] Adan also appeared nervous throughout his interactions with Officer Edwards. During the duration of the traffic stop, Adan left his blinker on. Officer Edwards believed this to be unusual and a sign of high stress, as most people turn the blinker off to get rid of the blinking sound. When Adan followed Officer Edwards back to the patrol vehicle, Adan was licking his lips, touching his face, and quivering. These actions made Officer Edwards believe that Adan was nervous.

[¶ 18] Tesfaye also exhibited different instances of nervousness throughout his interactions with Officer Edwards. When Officer Edwards first approached the vehicle on the passenger side, Tesfaye would not make eye contact; Tesfaye kept looking down toward the floor mat or at his feet and was generally evasive. Tesfaye did make eye contact with Officer Edwards later, when Officer Edwards questioned him about the presence of illegal substances in the vehicle. When asked if there was anything illegal or methamphetamine in the vehicle, Tesfaye held eye contact with Officer Edwards and answered, "No." However, when asked if there was marijuana in the vehicle, Tesfaye broke eye contact and looked down when he answered, "No."

#### B. Inconsistencies in Travel Plans

[¶ 19] When there are inconsistencies about the details of a trip, these inconsistencies may be used in forming a reasonable suspicion. *State v. Deviley*, 2011 ND 182, ¶ 12, 803 N.W.2d 561; *State v. Franzen*, 2010 ND 244, ¶ 15, 792 N.W.2d 533 (citing *Jones*, 269 F.3d at 928). When

Officer Edwards questioned Adan and Tesfaye individually about their travel plans, they gave conflicting stories. They both stated that they left from Fargo to drop a friend of Adan's off in western North Dakota. However, Adan stated that they dropped the friend off in Watford City, while Tesfaye stated it was in Williston. Additionally, when questioned by Officer Edwards to the identity of the friend, Tesfaye was unable to give a name. Officer Edwards testified that he believed this to be an indicator of criminal behavior as Tesfaye had ridden with the unnamed individual for a significant amount of time.

### C. Items in Vehicles

[¶ 20] The presence of different items in a vehicle can also be a factor in determining whether there was a reasonable suspicion of criminal activity. *Franzen*, 2010 ND 244, ¶ 16, 792 N.W.2d 533; *Deviley*, 2011 ND 182, ¶ 13, 803 N.W.2d 561. In *Franzen*, we noted that the presence of a masking odor is a relevant factor in our determination, specifically the presence of multiple air fresheners and an aerosol can air freshener. *Id.* at ¶ 13. In *Deviley*, we also acknowledged that an officer's suspicions could reasonably be "increased by the presence of [an] energy drink and [a] minimal amount of luggage." *Id.* at ¶ 13. While completing the traffic stop, Officer Edwards noticed that Adan and Tesfaye's vehicle contained a new air freshener, an aerosol can air freshener, a GPS, eye drops, an empty bottle of an energy drink, and a lack of luggage.

[¶ 21] Officer Edwards testified that through his training and experience he often sees scent eliminators, such as air fresheners, in his marijuana and drug arrests. Officer Edwards explained that drugs, especially marijuana, give off a very strong odor. Additionally, Officer Edwards thought the presence of the GPS

was significant for two reasons: first, because drug traffickers often go places they are unfamiliar with to obtain or drop off drugs; and, second, the drive from Fargo to either Watford City or Williston is simple, one right turn off of the interstate.

[¶ 22] Officer Edwards also found the presence of eye drops to be significant. Through his training and experience, Officer Edwards believed the presence of eye drops to be an indicator of marijuana use. He testified that eye drops were found, either on the individual or in the vehicle, in over half of his marijuana arrests. Officer Edwards explained that eye drops help treat the redness of the eyes which usually occurs after using marijuana. However, Officer Edwards also testified that there was nothing unusual about Adan's appearance and that neither Adan nor Tesfaye appeared to be under the influence of any drug.

[¶ 23] Officer Edwards also testified that it was common for him to see energy drinks and antacids in vehicles trafficking drugs, as the driver is trying to cover considerable distance in one stint. But, as stated above, the vehicle contained only one energy drink and no antacids.

[¶ 24] Additionally, Officer Edwards noted that he was unable to see any luggage which would typically be present on a multi-day road trip. However, Officer Edwards could not see into the trunk, nor did he inquire into whether the trunk contained luggage. Officer Edwards also did not observe any sort of drug paraphernalia in the vehicle. Although he did testify that it was not unusual to not find drug paraphernalia as some drug traffickers do not use the drugs they traffic.

### D. Criminal History

[¶ 25] Although by itself it is insufficient, a person's criminal history can support a finding of reasonable suspicion. *Fields*, 2003 ND 81, ¶ 15, 662 N.W.2d 242

(citing *United States v. Sandoval,* 29 F.3d 537, 542 (10th Cir.1994)). During the traffic stop, Officer Edwards determined that Tesfaye had a criminal history and had recently been placed on probation for a methamphetamine charge.

### E. Rental Vehicle

[¶ 26] Both Officers Edwards and Clark testified that there was some significance in Tesfaye and Adan driving a rented vehicle. They testified that in their experience, individuals who traffic drugs typically use a rental vehicle. Officers Edwards and Clark explained that a rental vehicle is preferred by drug traffickers because, in the event that they are caught, their personal vehicles would not be seized. Officer Edwards testified that the fact the vehicle was a rental was "extremely relevant" in his training and experience with regard to drug interdiction.

[¶ 27] Tesfaye argues that this Court cannot use innocent conduct, such as possession of eye drops, energy drinks, and driving a rental vehicle, in its analysis of reasonable and articulable suspicion. We agree that such conduct is not inherently suspicious. However, this Court does not view each fact in isolation; rather, we look at the totality of the circumstances to determine if reasonable, articulable suspicion exists. Therefore, considering the totality of the circumstances, including (1) Adan and Tesfaye both acting nervous; (2) they told Officer Edwards conflicting stories about the trip; (3) Tesfaye did not know the name of the passenger they dropped off; (4) the vehicle contained masking agents, a GPS, eye drops, and an energy drink; (5) Tesfaye had recently been put on probation for possession of methamphetamine; and (6) the vehicle was a rental, we conclude there was reasonable and articulable suspicion that Adan and Tesfaye were

engaged in criminal activity. And thus, their continued detention until a K–9 unit arrived was lawful.

### IV.

[¶ 28] We affirm the district court's judgments and orders denying Adan and Tesfaye's motions to suppress.

[¶ 29] DALE V. SANDSTROM, LISA FAIR McEVERS, JJ., concur.

McEVERS, Justice, concurring specially.

[¶ 30] I agree with, and have signed with, the majority. I agree with the district court that each little item noted by law enforcement in its own right would not be sufficient to form reasonable suspicion, but the amalgamation of the items does.

[¶ 31] I write separately to note the dissent attempts to create a new rule of law, stating, without authority, that for the seizure to be constitutionally acceptable, it could only be based on events that happened in Burleigh County. The dissent takes umbrage with the majority and the district court relying on events in Stark County to "bolster the conclusion that reasonable and articulable suspicion exists because the driver was 'nervous.'" *Dissent,* at ¶ 42. The dissent carefully cherry picks the evidence to determine which of the facts standing alone "add little or nothing to the calculus of whether reasonable suspicion exists." *Id.* at ¶ 43. I believe the dissent incorrectly applies the law, because what happened in Stark County, regardless of whether it is lawful activity or mundane activity, is part of the totality of the circumstances the detaining officer relied on to determine whether there was reasonable suspicion to extend the lawful traffic stop. Law enforcement is allowed to consider the tips received from other police officers or other informants, along

with their own observations, when determining reasonable suspicion. *State v. Kenner*, 1997 ND 1, ¶¶ 11–13, 559 N.W.2d 538.

[¶ 32] Looking at the entire event is required when looking at the totality of the circumstances, as is the consideration that law enforcement officers may take into account inferences that may elude a lay person. *State v. Fields*, 2003 ND 81, ¶ 13, 662 N.W.2d 242. What the dissent fails to see is that sometimes the whole is more than the sum of its parts. Consider as an analogy this itemized list: aluminum foil, coffee filters, a coffee bean grinder, a coffee pot, mason jars, plastic soda bottles, plastic straws, duct tape, liquid Drano, lithium batteries, lantern fuel, iodine, pseudoephedrine tablets, ephedrine tablets, and acetone. Each of these items individually are legal to possess and most of them are common items in our homes. But adding them together creates a meth lab. How many of these legal mundane items must law enforcement see, which standing alone would mean nothing, before there is reasonable and articulable suspicion?

[¶ 33] Here, there is no question the traffic stop is lawful. In regard to the additional detention, the district court made the following findings of fact to support reasonable and articulable suspicion: traveling below the speed limit; car had out-of-state license plates and was later determined to be a rental car; driver was stiff with hands at the 10–2 position; after braking for a car entering the interstate, the driver stayed in the left lane for an extended period; driver did not look at the officer as he passed; driver talking out of the side of his mouth to a passenger who was reclined and appeared to be sleeping; driver appeared to put something in the back seat as if to cover something up; driver did not turn off the blinker when stopped; air freshener, a bottle of Ozone scent spray, a Bic lighter, and a bottle of eye drops were on the floor of the car; GPS in the car; driver was shaking; Adan went to both the front seat and the back seat when he returned to the car to get the rental agreement; no visible luggage; Tesfaye had no identification; Tesfaye did not know the name of another passenger who had been riding with them; Tesfaye was on probation for possession of methamphetamine; and Tesfaye stated they dropped off the passenger in the Williston area instead of Watford City as stated by Adan. Also found by the district court, the officers testified that based on their training and experience a number of the items found in the car were suspicious to mask the odor of drugs, and drug traffickers use GPS and tend to use rental cars to avoid potential seizure of their personal vehicle.

[¶ 34] In addition to those facts found specifically by the district court, the majority opinion points out several additional factors as testified by law enforcement: Evasive behavior by Tesfaye; not looking the officer in the eye; and Adan was quivering, shaking, constantly licking his lips, and touching his face. In the officer's training and experience, this showed nervous behavior.

[¶ 35] While I agree that many of the findings standing alone may mean very little, when the totality of the circumstances is considered, there was reasonable suspicion to detain the defendants.

[¶ 36] Most concerning to me is the dissent's assertion that the defendants were detained based on their race. Adan and Tesfaye did not raise race as an issue in their motions to suppress. This assertion is not supported by the evidence presented to the district court. The officer was specifically asked in cross-examination whether the fact that the driver was African American was part of his suspicion, and the answer was "No." It is for the

district court to weigh the evidence and make credibility determinations. *State v. Rufus,* 2015 ND 212, ¶ 7, 868 N.W.2d 534. The district court made no finding that the officer's testimony was not credible. The dissent raises an issue not presented to the district court, and, without hearing the officer testify goes further by weighing the credibility of the officer's testimony. The dissent, in saying the appellants were the subjects by "driving while black" accuses, law enforcement of racial profiling, and implies the district court is not bright enough to see it. Seems like a mere hunch. Such an ungrounded assertion is uncalled for and undermines the public's trust, not only in law enforcement, but in the judicial system.

[¶ 37]   Lisa Fair McEvers

CROTHERS, Justice, concurring specially.

[¶ 38]   I reluctantly concur in the result because our precedent, and post *Rodriguez v. United States,* —— U.S. ——, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015), judicial decisions elsewhere, require that I do so. *See State v. Deviley,* 2011 ND 182, 803 N.W.2d 561; *United States v. Woods,* 829 F.3d 675, 680 (8th Cir.2016) (reasonable suspicion justified extending of a traffic stop for 40 minutes until arrival of drug dog); *United States v. Walton,* 827 F.3d 682, 689 (7th Cir.2016) (reasonable suspicion justified detaining two occupants for 22 minutes to perform a dog sniff); *United States v. Davis,* 620 Fed.Appx. 295, 300 (5th Cir. 2015) (reasonable suspicion supported extending traffic stop for a canine unit located 30 miles away to arrive 51 minutes after the initial stop).

[¶ 39]   Regarding reasonable articulable suspicion to extend the traffic stop, I agree with the dissent that out of state license plates, a rental car, a GPS device, no visible luggage, an air freshener, one energy drink container and eye drops provide little to no evidence of criminal activity. Kapsner dissent, ¶ 58. Standing alone, grounding suspicion of criminality on possession of these common things simply exposes too many people to prolonged detention to be reasonable under the Fourth Amendment. I also have come to agree with Justice Kapsner's warning in *Deviley* that we must be cautious of reasonable articulable suspicion built on "officer training and experience." *Deviley,* 2011 ND 182, ¶ 27, 803 N.W.2d 561 (J. Kapsner, dissenting). ("However, the phrase 'officer's training and experience' should not be used to mask what was operating in this case—the officer simply had a strong hunch that these individuals, driving a vehicle with an out-of-state license, were engaged in criminal activity. We have to be mindful not to let 'officer's training and experience' become a substitute for a showing of a true reasonable and articulable suspicion that a person is engaged in criminal activity.")

[¶ 40]   However, as the majority and Justice McEvers correctly point out, courts do not look at isolated facts in determining whether an officer possessed reasonable articulable suspicion. In *Fields,* this Court explained:

"Whether the facts support a reasonable and articulable suspicion is a question of law, fully reviewable on appeal. This Court considers the totality of the circumstances when deciding whether reasonable suspicion exists. Although we have recognized that the concept of reasonable suspicion is not readily reduced to a neat set of legal rules, it does require more than a 'mere hunch.' To determine whether reasonable suspicion exists, we apply an objective standard, taking into account the inferences and deductions that an investigating officer would make that may elude a layperson.

The question is whether a reasonable person in the officer's position would be justified by some objective manifestation to suspect the defendant was, or was about to be, engaged in unlawful activity."

*State v. Fields*, 2003 ND 81, ¶ 13, 662 N.W.2d 242 (internal citations and quotation marks omitted).

[¶ 41] Here, the driver and passenger ostensibly disagreed on their destination. Tesfaye had no identification, did not know the name of the passenger they dropped off in North Dakota and was on probation for possession of methamphetamine. The district court apparently found credibility in the officers' testimony that, based on training and experience, Adan showed unusual nervousness by quivering, shaking, constantly licking his lips and touching his face. These facts, considered together with the otherwise innocent conduct and items, provided reasonable articulable suspicion of criminal activity allowing the defendants to be detained beyond completion of the traffic stop.

[¶ 42] Whether reasonable articulable suspicion exists to prolong defendants' detention is only part of the question, however. The remaining inquiry is whether the duration of the post-traffic offense detention was reasonable.

[¶ 43] I am troubled by the defendants' 45 minute roadside detention while awaiting arrival of a drug-sniffing dog, especially given the thin suspicion to detain. However, neither party has argued the length of permissible detention is regulated by the depth of suspicion and, other than my own calculus from which I have been unable to craft a rule of law, I have found no case advancing the notion. Therefore, once reasonable articulable suspicion exists, focus must remain on the length of detention alone.

[¶ 44] "An officer … may conduct certain unrelated checks during an otherwise lawful traffic stop. But … he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 135 S.Ct. at 1615. Upon completion of a traffic stop, the continued detention of automobile occupants is a *Terry* stop requiring its own reasonable articulable suspicion. The *Terry* stop has limits:

"The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure."

*Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983) (internal citations omitted).

[¶ 45] At some point, the duration of a driver's detention awaiting arrival of a drug dog will violate the Fourth Amendment. *See* Wayne R. LaFave, Search and Seizure: A Treatise of the Fourth Amendment, 4 Search and Seizure § 9.2(f), n. 234 (5th ed.2016). ("The Supreme Court has recognized a 'liberty interest in proceeding with [an] itinerary,' *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d

110 (1983), and thus the length of a detention is more likely to pass muster if 'the detention did not interfere with defendant's travel plans.') *United States v. Tavolacci,* 895 F.2d 1423 (D.C.Cir.1990)." Where that point lies is unclear. Post-*Rodriguez* judicial decisions suggest a 45 minute seizure while waiting for a drug dog is permissible. But I am skeptical whether that length of detention would be tolerated for other *Terry* stop situations, and if it was an issue before the court I would question whether the duration of seizure is permissible for travelers on the interstate highway system.

[¶ 46] Daniel J. Crothers

KAPSNER, Justice, dissenting.

[¶ 47] If this stop and later seizure were to be constitutionally acceptable, it would have to be solely on the basis of what happened in Burleigh County and not with any reference to what happened in Stark County. What was observed in Stark County added no objective basis for the eventual detention and search. In Stark County, two men were seen in a car with out-of-state plates. The car was going slightly under the speed limit. The driver had his hands at "ten and two" and did not look at the officer driving beside him. The driver appeared to talk out of the side of his mouth to a passenger whose posture would indicate he was sleeping and the driver reached into the back seat. These mundane observations add very little to the calculus of a finding of reasonable suspicion. What the majority opinion does not mention is that the two men in the car with out-of-state license plates are black. In my opinion, the appellants were the subjects of a blatant case of "driving while black."

[¶ 48] Tesfaye and Adan may or may not have come to the attention of law enforcement in Burleigh County for speeding, but the fact is Officer Clark in Stark County directed another officer in another county to be on the lookout for the car on the basis of information that Officer Clark acknowledged gave him no reason to stop the car. It is also worth noting Officer Clark had to turn his vehicle around after spotting the appellants traveling in the opposite direction. He followed the vehicle for roughly seven miles before deciding to disengage.

[¶ 49] At the suppression hearing, Officer Clark was asked by defense counsel on cross-examination:

Q. Could you see the driver and his features?

A. I saw a male driver. Yes.

Q. Did you take any notice of his skin color?

A. I observed he was African American. Yes.

Q. Did that play into your suspicion?

A. No.

Officer Clark testified the fact the men appeared to be African–American "played no role" in his decision to tell another officer in another county "if you could try and keep an eye out for the vehicle and if you can get a stop on it, see what's going on." Officer Clark could not remember if he had relayed the racial information to Officer Edwards. Officer Edwards observed the car in Morton County, had to turn around, and ultimately stopped the car in Burleigh County for following too close and traveling 65 miles per hour in a 60–mile–per–hour zone.

[¶ 50] Even if the directed stop was a total pretext, there is no license to drive five miles over the speed limit, so the stop for speeding was valid. *Whren v. United States,* 517 U.S. 806, 819, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Officer Edwards issued a warning to Adan, which completed the purpose of the stop.

[¶ 51] Reasonable and articulable suspicion was necessary to justify the continued seizure of the two men. *Rodriguez v. United States,* —— U.S. ——, 135 S.Ct. 1609, 1614–15, 191 L.Ed.2d 492 (2015); *State v. Fields,* 2003 ND 81, ¶ 10, 662 N.W.2d 242. I dissent from the majority's holding that reasonable and articulable suspicion justified holding the two men for forty-five minutes to bring a drug dog to the scene. "[A] dog sniff is not fairly characterized as part of the officer's traffic mission." *Rodriguez,* 135 S.Ct. at 1615.

[¶ 52] Both the district court and the majority rely on events in Stark County to bolster the conclusion that reasonable and articulable suspicion exists because the driver was "nervous." Aside from the fact he was African–American and the car had out-of-state license plates, this assumption is made from the fact that he was driving in Stark County within the speed limit, with his hands on "ten and two," did not look at the officer driving beside him, and possibly placed something in the back seat. These facts do not tend to lead to a conclusion a crime was being or about to be committed, regardless of any level of "training or experience." What suggestion of criminal activity does this articulate? The officer and the majority rely on "nervousness" but being nervous is not criminal and unless this Court is going to reverse *Fields,* 2003 ND 81, ¶ 19, 662 N.W.2d 242, it is not sufficient.

[¶ 53] The fact Adan was in a vehicle with an out-of-state license plate should add little or nothing to the calculus of whether reasonable suspicion exists. "It is wholly improper to assume that an individual is more likely to be engaged in criminal conduct because of his state of residence[.]" *Vasquez v. Lewis,* 834 F.3d 1132, 1138 (10th Cir.2016). I agree with the Tenth Circuit that "it is time to abandon the pretense that state citizenship is a permissible basis upon which to justify the detention and search of out-of-state motorists[.]" *Id.* "Absent a demonstrated extraordinary circumstance, the continued use of state residency as a justification for the fact of or continuation of a stop is impermissible." *Id.* In this case, the stop was over as soon as the warning was given to Adan.

[¶ 54] Officer Edwards articulates his reasons for finding the driver suspicious in a manner that suggests he is rejecting common sense reasons for his observations in favor of finding them suspicious. According to Officer Edwards, a man without a coat who has walked through 30–degree windy weather does not shiver because he is cold:

> Besides the quivering shoulders, I didn't see any quivering of, like, the mouth. When you get cold, your teeth chatter. I didn't see quivering of any other area except just the shoulders, where it could be nerve induced, I guess.

[¶ 55] Officer Edwards finds the driver's and passenger's stories inconsistent. The driver said he dropped another passenger off "in Watford City," the passenger said "in the Williston area," not, as the majority says, "in Williston."

[¶ 56] The reason for finding the presence of a GPS suspicious borders on ridiculous. GPS devices have become so ubiquitous in today's technological society that the presence of a GPS unit in a vehicle traveling on an interstate highway should not be surprising, much less suspicious. Officer Edwards carefully explained that drug traffickers "are doing cross country travel where they don't know where they're going." Adan and Tesfaye's trip was from St. Cloud, Minnesota, to Watford City.

So from Fargo to Watford City, which would consist of, typically, traveling

along I–94 and taking one right-hand turn on Highway 85.

Q. So it's just a simple trip with one turn is something you typically wouldn't need a GPS for?

A. Correct.

Apparently North Dakotans and those who travel here have no need of technology to find locations within the state, or, we are suspicious if we use it. If that is the case, every driver with a "smart phone" is suspicious.

[¶ 57] Officer Edwards found it suspicious that the two men were traveling across two states, but he did not see luggage in the car. He acknowledged he did not ask them if they had luggage or look in the trunk before reaching this conclusion. Officer Edwards also noted Officer Clark made him aware that Adan and his passenger were driving a rental car. There is nothing inherently suspicious in an individual's use of a rental car. *See, e.g., United States v. Beck,* 140 F.3d 1129, 1137 (8th Cir.1998) (holding there was nothing inherently suspicious about the defendant's use of a rental car); *United States v. Wood,* 106 F.3d 942, 947 (10th Cir.1997) (finding the defendant's use of a rental car was not inherently suspicious).

[¶ 58] Officer Edwards found the presence of an air freshener, an Ozone spray, and a cigarette lighter suspicious. We have said the presence of odor maskers can contribute to reasonable and articulable suspicion. *State v. Franzen,* 2010 ND 244, ¶ 16, 792 N.W.2d 533. However, Officer Edwards testified neither Adan or his passenger seemed under the influence or exhibiting strange behavior; Officer Edwards did not detect any odor of marijuana; Adan stopped appropriately when pulled over, although he left his turn signal on; Adan had no trouble locating his driver's license; Office Edwards saw nothing that indicated drug paraphernalia; he saw

no signs that Adan had ingested drugs; he saw no indicators of any driving impairment; Adan did not appear to be intoxicated; there was nothing unusual about Adan's eye color; Adan was "very decent to talk to. Upbeat, almost talkative. Very cooperative" until he was told he was being detained to bring a drug dog:

[¶ 59] While reasonable suspicion is something determined under the totality of the circumstances, such a finding should not be created based upon piling up of innocuous facts. It is "impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." *Beck,* 140 F.3d at 1137. The concrete reasons in this case go no further than simply claiming each innocuous fact is suspicious in connection with the officers' "training and experience."

[¶ 60] Officer Edwards issued a warning about fifteen minutes after he stopped Adan. At that point the purpose of the stop was complete. Officer Edwards decided to detain Adan and call for a drug dog when Adan declined his request to search the car. At that time, Officer Edwards had nothing more than a hunch, which proved to be a good hunch, there were drugs in the car. "[A] search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success." *United States v. Di Re,* 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 210 (1948). "[A] mere hunch does not create reasonable suspicion[.]" *Navarette v. California,* —— U.S. ——, 134 S.Ct. 1683, 1687, 188 L.Ed.2d 680 (2014). As the majority notes, "[t]he question is whether a reasonable person in the officer's position would be justified by some objective manifestation to suspect the defendant was, or was about to be, engaged

in unlawful activity." *State v. Kenner*, 1997 ND 1, ¶ 8, 559 N.W.2d 538.

[¶ 61] While there were odor maskers present in this case like in *Franzen*, based on Officer Edwards' description of Adan's demeanor and behavior, there was no "extreme and persistent nervousness" or evidence of a drug culture to support a finding of reasonable suspicion. 2010 ND 244, ¶ 14, 792 N.W.2d 533. In this case, the arresting officer tried to rely on the absence of illegal activity, even law-abiding activity, to suggest that reasonable and articulable suspicion existed. This driver was sought out initially by Officer Edwards for law-abiding driving in Stark County. He found it suspicious to have a GPS for a "simple trip with one turn." Officer Edwards was asked whether his "training and experience" would suggest drug traffickers are not under the influence when they are arrested. His answer was that "videos" indicate people who are transporting are not under the influence. This suggests that it is equally suspicious to appear and not to appear to be under the influence of a substance.

[¶ 62] Whether reasonable and articulable suspicion exists is a question of law and fully reviewable on appeal. *Fields*, 2003 ND 81, ¶ 6, 662 N.W.2d 242. It must be determined under the totality of the circumstances. *Navarette*, 134 S.Ct. at 1687. The courts are gatekeepers to this decision. "[A] traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete [the] mission' of issuing a warning ticket." *Rodriguez*, 135 S.Ct. at 1614–15 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005)). What is articulated by an arresting officer must be reasonable and must pass a credulity test. If it does not, a completed valid stop cannot be extended in the hopes of drug interdiction. *Rodriguez*, at 1614–15. What Officer Edwards articulated passes neither test. I would reverse and allow Adan and Tesfaye to withdraw their guilty pleas.

[¶ 63] Carol Ronning Kapsner